## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KRISTIN BAUM, on behalf of herself and
all others similarly situated,

      **Plaintiff,**

    **v.**

ASTRAZENECA LP,

      **Defendant.**

Civil Action No. 3:07-cv-00090-KRG

Judge: Kim R. Gibson

## MEMORANDUM IN SUPPORT OF ASTRAZENECA LP'S MOTION
## FOR SUMMARY JUDGMENT AS TO THE CLAIMS OF KRISTIN BAUM

In her own words, Plaintiff Kristin Baum's ("Baum's") primary duty as a Pharmaceutical

Sales Specialist for Defendant AstraZeneca Pharmaceuticals LP ("AstraZeneca") was to

"[i]ncrease market share" for a portfolio of prescription drugs "through personal selling, [a]

commitment to bring value to physicians and professionalism." Defendant's Statement of

Undisputed Material Facts ("SUF") ¶ 19. This fact notwithstanding, Baum now premises a

claim for overtime compensation on a counterintuitive legal contention that has been rejected by

every court that has considered it. Specifically, she claims that she did not qualify as an exempt

outside salesperson because, as a pharmaceutical sales representative, she did not "truly" engage

in sales. Rather, Baum claims, she merely promoted prescription pharmaceuticals to physicians

(rather than patients), and did not collect money in exchange for those products.

Baum's argument merely glorifies a distinction without a difference. In her

Pharmaceutical Sales Specialist position, Baum spent the vast majority of her time on the road,

making sales calls on physicians who, through the writing of prescriptions, control the purchase

of AstraZeneca pharmaceuticals on behalf of their patients. Baum's job was to persuade these physicians to write more AstraZeneca prescriptions, for approved uses. She was hired as a salesperson. She referred to herself as a salesperson. She was trained in sales techniques. She was evaluated on her ability to close with her physician customers, and she was compensated based on sales that she generated. In short, during her employment with AstraZeneca, Baum embodied all of the hallmarks of – and was – an outside salesperson, and she was properly classified as exempt.

Setting all this aside, however, Baum's claims remain fatally flawed even if she could successfully argue that the outside salesperson exemption does not apply to her (which, of course, it does). As an initial matter, while Baum contends that her work as a Pharmaceutical Sales Specialist constituted promotional (rather than sales) work, activities such as advertising, marketing, and promoting sales are all quintessential examples of exempt *administrative* functions. Thus, assuming *arguendo* that Baum somehow failed to qualify for Pennsylvania's outside salesperson exemption, she would qualify for the State's administrative exemption, as confirmed by long-standing precedent in this Circuit. See Cote v. Burroughs Wellcome Co., 558 F. Supp. 883, 885 (E.D. Pa. 1982) (finding administratively exempt an employee whose job duties involved "call[ing] regularly on physicians, hospitals, and pharmacies and to increase the sale of [prescription] products by 'detailing' the recommended indications of these drugs to potential prescribers").

Moreover, and in any event, Baum's claims in this case – Pennsylvania state-law claims – are preempted by the Fair Labor Standards Act ("FLSA"). In 1947, Congress amended the FLSA so as to (i) limit wage claims like Baum's to employees who asserted claims in their own right and (ii) free employers of the burden of representative actions. The Pennsylvania statutes

under which Baum proceeds, however, permit and promote the exact opposite, blocking the accomplishment and execution of Congressional purposes and objectives. In short, Baum's claims cannot stand, and this Court should grant AstraZeneca's Motion for Summary Judgment ("Motion").

## RELEVANT FACTUAL BACKGROUND

### A.    The Parties

Defendant AstraZeneca LP ("AstraZeneca") is engaged in the business of research, development and manufacturing of pharmaceutical products designed to fight disease in major areas of healthcare. SUF ¶ 1. AstraZeneca employs thousands of individuals, including a field-based sales force of Pharmaceutical Sales Specialists. SUF ¶ 2.

On April 13, 1998, AstraZeneca hired Baum. SUF ¶ 3. In her first four years with the Company, she held a variety of non-sales positions, but she had "always wanted to be in sales." SUF ¶¶ 4, 6. As such, on May 1, 2003, she began work for AstraZeneca as a Pharmaceutical Sales Specialist, and she held this position until November 1, 2006. SUF ¶ 5. As a Pharmaceutical Sales Specialist, Baum first worked on AstraZeneca's respiratory team and later shifted to the cardiovascular team. SUF ¶ 7. She sold a variety of respiratory and cardiovascular drugs, all of which patients could obtain only via a doctor's prescription. SUF ¶ 8. She worked with a small team, or "cylinder," of Pharmaceutical Sales Specialists with whom she coordinated her sales efforts. SUF ¶ 9.

### B.    Baum's Training and Duties

Baum's primary function as a Pharmaceutical Sales Specialist was to "[i]ncrease market share" for a portfolio of prescription drugs "through personal selling, [a] commitment to bring value to physicians and professionalism." SUF ¶¶ 19, 20. To allow her to carry out this function, AstraZeneca provided Baum with extensive training on the products that she would be

selling as well as how to sell them.  SUF ¶¶ 10, 15.  Specifically, Baum was trained on AstraZeneca's selling philosophy, the Interactive Strategic Selling ("ISS") model.  SUF ¶ 11. Among other things, the ISS Model included an emphasis on "closing" (i.e., "a well timed & well stated question to garner business"), required the Pharmaceutical Sales Specialist to use a "complex thinking process" in having a dialogue with a physician, and asked Pharmaceutical Sales Specialists to "leverage current success" with physicians to "expand market" and "motivate customer[s] to switch from competitive product[s]." Id.

Baum engaged in role-playing as part of her sales training – the trainers pretended to be doctors, and Baum engaged them in practice product discussions and asked for a commitment from these "doctors" to prescribe her products.  SUF ¶ 13.  After the initial training period, Baum also received field training by accompanying experienced Pharmaceutical Sales Specialists and managers on calls in the field.  SUF ¶ 14.  In addition, Baum enrolled in outside classes to obtain more knowledge of disease states in order to be more effective in her calls with medical professionals.  SUF ¶ 16; see also id. ¶¶ 17, 18.

After the completion of her training, Baum spent "the vast majority" of her working time in the field making calls to doctors in her territory.  SUF ¶ 21.  In making these calls, Baum was almost wholly free of direct supervision – she worked in the field alone most of the time; her manager accompanied her only once per month or once every other month.  SUF ¶¶ 45, 46.

On her calls, Baum needed to use her judgment to determine the best method to gain access to physicians and to develop relationships with the physicians and their staffs.  SUF ¶ 25 (Baum's testimony that "I mean, my skills and abilities were to gain access.  I mean, to build relationships"); see also SUF ¶ 24 (Baum's testimony that she used "innovative themes to gain access"); SUF ¶ 26.  The length of Baum's typical calls varied anywhere from two minutes to

four hours, depending upon the nature of the call and "[w]hat kind of conversation you are having." SUF ¶¶ 29, 30. Baum's longer calls – from two to four hours long – often took the form of breakfasts, "lunch and learns" or dinners, which were known as "access meals" and occurred two to three times each workday. SUF ¶¶ 27, 28. It was Baum's responsibility to maintain the physician's interest, to uncover his or her needs, and to make her sales calls as effective as possible. SUF ¶¶ 32-35.

During Baum's calls, she explained the strengths of AstraZeneca products, and she sought to persuade physicians to write more prescriptions for those products. SUF ¶¶ 36, 37. She concluded her calls by asking the physician for a commitment to prescribe the pharmaceuticals that she was selling for approved uses. SUF ¶ 38.

In addition, Baum organized and attended speaker programs, which were promotional programs intended to be educational in nature. SUF ¶ 43. Baum herself did not speak at these programs, but she testified that "my presence will make you think of the drug I am selling." Id. As always, Baum's goal was to increase prescription growth among her physician customers:

> "If they [doctors] weren't writing [prescriptions], then we would just ask more questions. Get more data from the doctor. And do what we could to get them to write more. Given the tools we had by the company. I mean, if it meant bringing in a national speaker. I mean, whatever approved resources that I had there approved by the company, that is what I would use."

SUF ¶ 44.

Baum was evaluated on, among other things, her sales performance. Baum's annual performance evaluations contained a description of Baum's territory sales objectives and an assessment of Baum's efforts to achieve those objectives. SUF ¶ 48. Her manager accompanied her on sales calls once every one to two months, and prepared "field coaching forms" which contained an evaluation of Baum's selling skills, activities and accomplishments in the field.

-5-

SUF ¶ 47. Sales performance is also an important factor taken into account when evaluating whether a PSS should be promoted. SUF ¶ 49. Further, a portion of Baum's compensation was tied to achievement of sales targets and product sales within her assigned geography. SUF ¶ 50.

## C. Procedural History

On or about March 27, 2007, Baum commenced this action as a putative class action by filing a complaint in the Court of Common Pleas of Westmoreland County, Pennsylvania. (Notice of Removal, Docket Entry No. 1, at Exhibit 2 (Original Complaint.).) AstraZeneca subsequently removed the matter to this Court. (Id.) In this matter, Baum alleges that she and her putative class were misclassified as exempt for purposes of Pennsylvania law, and she seeks overtime compensation she claims to be due under the Pennsylvania Minimum Wage Act ("PMWA") and Wage Payment Collection Law ("WPCL").[1] (Consolidated Amended Class Action ("Complaint"), Docket Entry No. 16, at ¶¶ 31-39). Baum's primary contention is that AstraZeneca's Pharmaceutical Sales Specialists did not qualify for Pennsylvania's outside salesperson exemption because they did not "sell" for purposes of that exemption, but rather merely "promoted" AstraZeneca products.

## ARGUMENT AND CITATION OF AUTHORITY

Through the instant Motion, AstraZeneca seeks summary judgment on Baum's individual claims. Under Rule 56(c), summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See FED. R. CIV. P. 56(c). Where the moving party has met its initial summary judgment burden, the nonmoving party may escape summary judgment only by demonstrating the existence of some factual issue requiring trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986);

---

[1] This case was originally consolidated with that of another plaintiff, but that individual has subsequently dropped out of the litigation. (Docket Entry No. 44.) Baum is the only Named Plaintiff in the case.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). It is an "axiom of summary judgment practice" that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 253 (3rd Cir. 2007) (quoting Anderson, 477 U.S. at 252). Rather, the plaintiff must adduce "evidence on which the jury could reasonably find for the plaintiff." Id.

Here, for three independent reasons, Baum's claims for overtime compensation fail as a matter of law. Accordingly, and because no class has been certified in this matter, this case should be dismissed in its entirety with prejudice.

## I.     Baum Was Exempt Under Pennsylvania's Outside Salesperson Exemption.

Initially, Baum's claims fail because AstraZeneca properly classified her as an exempt outside salesperson. Pennsylvania law has long provided that "outside sales[persons]," such as Baum, are exempt from the State's overtime provisions. See 43 P.S. § 333.104(c); 34 Pa. Code § 231.85. To qualify for this exemption, an employee must be "customarily and regularly engaged more than 80% of work time away from the employer's place or places of business" in "[m]aking sales" or "[o]btaining orders." 34 Pa. Code § 231.85. In addition, the employee must spend no more than 20% of his or her weekly hours "in work of a nature not directly related to and in conjunction with the making of sales." Id.

Courts regularly find that persons with duties such as Baum's satisfy this type of test. See Menes v. Roche Labs., Inc., No. 2:07-cv-01444-ER-FFMx, 2008 U.S. Dist. LEXIS 4230 (C.D. Cal. Jan. 7, 2008) (granting summary judgment to the employer; finding pharmaceutical sales representative exempt under outside salesperson exemption) (appeal pending); Barnick v. Wyeth, 522 F. Supp. 2d 1257 (C.D. Cal. 2007) (same) (appeal pending); D'Este v. Bayer Corp., No. CV 07-3206-JFW (PLAx), 2007 U.S. Dist. LEXIS 87229 (C.D. Cal. Oct. 9, 2007) (same)

(appeal pending). The undisputed evidence demonstrates that Baum likewise was properly classified as exempt.

## A. Baum Made Sales And Obtained Orders

To begin with, Baum's duties involved "[m]aking sales" and "[o]btaining orders." 34 Pa. Code § 231.85. Either function is sufficient to satisfy the requirements of Pennsylvania's outside salesperson exemption. Baum did both.

### 1. Baum's Job Was Making Sales

Baum's duties plainly involved making sales. Every court to have considered the issue has ruled that pharmaceutical sales fully qualify as "sales" under the outside salesperson exemption and has accordingly granted summary judgment for the employer.

For instance, in the D'Este case, which arose under California's analogous outside salesperson exemption, the court found that the plaintiff engaged in sales for purposes of the exemption because she was hired, functioned, and treated as a salesperson:

> Plaintiff was hired by Bayer and then evaluated throughout her employment with Bayer on her ability to "increase sales of [Bayer] products (i.e., change prescribing behavior [of medical providers])." Because patients are unable to obtain Bayer's products directly and must have a prescription from a physician, Bayer directs the focus of its sales efforts at doctors who are responsible for making the purchasing decision on behalf of the patient. As plaintiff admitted during her deposition, the doctors are the "customers" of Bayer and Plaintiff's job was to "close" the doctors in her territory by getting them to "commit" to writing more prescriptions for Bayer's products. Each prescription filled by a patient is a "sale" for Bayer, and Plaintiff was paid commissions for the increased sales from filled prescriptions written by the doctors in her territory.

D'Este, 2007 U.S. Dist. LEXIS 87229 at *13. The Court also noted that, given the plaintiff's lack of supervision in the field, applying the outside salesperson exemption to plaintiff was

consistent with the exemption's "spirit and purpose." Id. at *14-15 (citing Jewel Tea Co. v. Williams, 118 F.2d 202, 207-208 (10th Cir. 1941)).

In the Barnick case, the court likewise faced the issue of whether a pharmaceutical seller with duties similar to Baum's engaged in sales. Applying similar logic to that employed by the D'Este court, the Barnick court reached the same result – summary judgment for the employer. Once again, the Court was persuaded by the plaintiff's actual job duties, which mirrored those of the plaintiff in D'Este and those of outside salespersons in other industries:

> Plaintiff was hired on the basis of his sales experience for a job referred to both by himself and his employer as a sales position. Throughout his employment for Wyeth, Plaintiff received regular specialized sales training at sales conferences. Plaintiff was expected to and did in fact occasionally solicit new business for Defendant. Most significantly[,] Plaintiff's pay was determined at least in part on the basis of sales he generated. Additionally, Plaintiff, despite certain restrictions placed on his activities by Wyeth, received virtually "no direct or constant supervision in carrying out" his daily work.

Barnick, 522 F. Supp. 2d at 1263 (citing Nielsen v. Devry, Inc., 302 F. Supp. 2d 747, 758 (W.D. Mich. 2003)).

Most recently, in the Menes case, the court granted summary judgment to the employer based upon the practical realities of the plaintiff's position:

> [T]he Court concludes that the Plaintiff was properly classified as an exempt outside sales person . . . because the Plaintiff was hired and evaluated based on her ability as a salesperson, received training through her employer on sales techniques, received some compensation based on the total amount of products sold in her territory, and solicited new customers on her own.

Menes, 2008 U.S. Dist. LEXIS 4230 at *7. As in the D'Este, Barnick, and Menes cases, Baum was engaged in "[m]aking sales" for purposes of Pennsylvania's outside salesperson exemption. 34 Pa Code § 231.85.

COI-1394880v7

First, and notwithstanding the legal position she has adopted in this case, Baum admits that she was engaged in sales and that everything she did was designed to win business for AstraZeneca. Indeed, Baum "love[d] sales," (SUF ¶ 51), and she became a Pharmaceutical Sales Specialist because she "always wanted to be in sales." SUF ¶ 6. Her function as a Pharmaceutical Sales Specialist was to "[i]ncrease market share" for AstraZeneca prescription drugs through "personal selling." SUF ¶ 19 (emphasis added). During her tenure as a PSS, in fact, Baum utilized "personal selling and develop[ed] my ISS selling skills – making sure I uncover a need for all targets to ensure value is provided in each call." SUF ¶ 33. She focused on "Clinical Selling that shows the advantage of our products to the competitors . . . ." SUF ¶ 52. She was expected to "ask for the business" on every sales call she made, and she in fact asked doctors for commitments to prescribe AstraZeneca products for approved uses. SUF ¶¶ 38-40. Moreover, she and her co-worker identified "opportunity" and "growing" doctors (i.e. high priority targets for their sales efforts), describing the specific actions they intended to take to focus their selling efforts and the number of prescriptions they intended to ask from each doctor per month. SUF ¶ 55; see also SUF ¶¶ 53, 54. In short, and under the plain meaning and conception of that term, Baum was a salesperson.

Second, Baum performed the very duties that qualify as sales as a matter of law. Specifically, as noted above, because patients may obtain prescription pharmaceuticals only with a prescription provided by a licensed physician, doctors are customers of pharmaceutical companies for purposes of the outside salesperson exemption – and efforts to persuade doctors to write more prescriptions for a particular company's products constitute "sales" as a matter of law. See Barnick, 522 F. Supp. 2d at 1264 ("[b]ecause physicians determine whether or not a patient will buy a prescription product, it is they who are appropriately the target for sales efforts

and appropriately considered Wyeth's customers."); see also D'Este, 2007 U.S. Dist. LEXIS 87229 at *14 (noting that "the buyer is the doctor who has the capacity to 'place an order' for Bayer's product by writing a prescription for a patient"). This logic is not limited to exemption cases. In analogous decisions regarding the closely related market for regulated medical devices, courts have held that representatives for device companies are salespersons, selling to doctors who act as agents on behalf of patients who formally purchase the device. See Medtronic, Inc. v. Benda, 689 F.2d 645, 648 (7th Cir. 1987) (holding that "the physicians were the 'real' purchasers of the pacemakers even though the formal sale was made . . . to the hospital" and that it is "primarily the physician who influences and even decides which pacemaker . . . will be purchased"); see also Medtronic, Inc v. Gibbons, 527 F. Supp. 1085, 1089, 1094 (D. Minn. 1981) (similar), aff'd, 684 F.2d 565 (8th Cir. 1982); cf. Mazur v. Merck & Co., Inc., 964 F.2d 1348, 1355 (3rd Cir. 1992) (describing Pennsylvania's "learned intermediary" doctrine, under which drug manufacturers satisfy their duty to warn a drug consumer of adverse drug effects "by providing an adequate warning to a [physician] as opposed to the general public or individual users").

Likewise, here, Baum's duties qualify as "sales" as a matter of law. Baum was responsible for calling on approximately 150 doctors in her territory, and she understood that AstraZeneca considered doctors to be "customers." SUF ¶¶ 22, 23. She engaged these doctors in persuasive dialogues designed to influence their prescribing behavior for appropriate patient care:

> Q:   Was it part of your job to help persuade [physicians] to
>      write prescriptions for AstraZeneca products?
>
> A:   Yes.

SUF ¶ 37. And, she concluded her physician calls with a request for "commitment . . . to prescribe the products." SUF ¶ 38. Indeed, her strategy for achieving sales objectives included "asking for the business on every call." SUF ¶¶ 39, 40. She used the ISS model in her sales calls, which concluded each sales call with a "close" designed to "garner business" and asked Pharmaceutical Sales Specialists to "leverage current success" with physicians to "expand market" and "motivate customer[s] to switch from competitive product[s]." SUF ¶¶ 11, 12. This is the essence of selling, and it demonstrates that Baum was an outside sales person. See, e.g., Menes, 2008 U.S. Dist. LEXIS 4230 at *7; Barnick, 522 F. Supp. 2d at 1262-63; D'Este, 2007 U.S. Dist. LEXIS 87229 at *13-14.

Third, Baum's duties and experiences were in line with the plaintiffs in the Menes, Barnick, and D'Este cases in each and every respect. For instance, in confirming the applicability of the outside salesperson exemption, those cases noted that the plaintiffs had received sales training. Here, AstraZeneca extensively trained Baum as a salesperson. Before she was sent to the field as a Pharmaceutical Sales Specialist, Baum received extensive instruction on the Company's products and its "Interactive Strategic Selling" model, the embodiment of AstraZeneca's sales philosophy and methodology, which Baum admitted she used on her sales calls. SUF ¶¶10-12; see also SUF ¶¶ 13-18.

Similarly, Menes, Barnick, and D'Este focused on the fact that the plaintiffs were evaluated based on their ability to increase sales. The same was the case with Baum. Every one to two months, Baum's manager would ride along with her throughout her day, evaluating Baum on selling skills, activities, and accomplishments. SUF ¶¶ 46, 47. Baum's annual performance evaluations contained an assessment of Baum's efforts to achieve sales objectives. SUF ¶ 48.

COI-1394880v7

And sales performance was an important factor in determining whether Baum was ready to be promoted to a higher level Pharmaceutical Sales Representative position. SUF ¶ 49.

Further, in ruling for the employer, <u>Menes</u>, <u>Barnick</u>, and <u>D'Este</u> highlighted the fact that the plaintiffs were compensated in part based upon sales. Likewise, in this matter, Baum earned incentive compensation based in part on hitting sales targets and product sales based on market share or total prescriptions and/or new prescriptions within her assigned geography. SUF ¶ 50.

Moreover, as in <u>Menes</u>, <u>Barnick</u>, and <u>D'Este</u>, Baum was expected to, and routinely did, solicit new business for AstraZeneca. Indeed, as noted, Baum's primary objective as a Pharmaceutical Sales Specialist was to "[i]ncrease market share for portfolio of products," necessitating that she bring additional business to the Company. SUF ¶ 19. In sum, Baum's duties wholly mirrored those of the plaintiffs in the <u>Menes</u>, <u>Barnick</u>, and <u>D'Este</u> cases, providing further support for the fact that she was engaged in outside sales for AstraZeneca.

<u>Finally</u>, a finding that Baum was engaged in sales fits squarely within and furthers the purpose of the outside salesperson exemption itself. The exemption exists to accommodate employment relationships involving employees who operate with little supervision, typically have an incentive to work longer hours in order to increase commissions and sales-based bonuses, and whose hours cannot be effectively tracked or controlled. As the Tenth Circuit stated in considering the Fair Labor Standards Act's ("FLSA's") outside sales exemption:

> The reasons for excluding an outside salesman are fairly apparent. Such salesmen, to a great extent, work[] individually. There are no restrictions respecting the time he shall work and he can earn as much or as little, within the range of his ability, as his ambition dictates. In lieu of overtime, he ordinarily receives commissions as extra compensation. He works away from his employer's place of business, is not subject to the personal supervision of his employer, and his employer has no way of knowing the number of hours he works per day. To apply hourly standards primarily devised for an

employee on a fixed hourly wage is incompatible with the
individual character of the work of an outside salesman.

Jewel Tea Co. v. Williams, 118 F.2d 202, 207-208 (10th Cir. 1941).

Likewise Baum spent the vast majority of her time alone in the field, almost wholly without direct supervision. SUF ¶ 45. And, as previously discussed, a significant portion of Baum's compensation reflected her ability to generate sales in her sales territory, providing her an incentive to work longer hours. SUF ¶ 50. In short, Baum was the very type of employee that the outside salesperson exemption was designed for, underscoring the fact that she was a person engaged in sales.

### 2. Baum Obtained Orders In Her Job

While the fact that Baum made sales is sufficient to establish her eligibility for the outside salesperson exemption, the undisputed evidence demonstrates that Baum also qualified because she was engaged in "[o]btaining orders." 34 Pa. Code § 231.85(2).

Specifically, Pennsylvania statutes explicitly provide that a doctor's prescription is an "order." See 63 P.S. § 390-2 (defining a "prescription" as "a written or oral order issued by a duly licensed medical practitioner in the course of his professional practice for a controlled substance, other drug or device or medication which is dispensed for use by a consumer"); 35 P.S. § 780-102 (defining a "prescription" as "an order for a controlled substance, other drug or device for medication which is dispensed to or for an ultimate user"). For her part, Baum directed her efforts toward obtaining prescriptions for AstraZeneca products. As noted, Baum admitted that her job was to persuade physicians to write additional prescriptions for AstraZeneca products, and she in fact routinely asked doctors to commit to prescribe for approved uses. SUF ¶¶ 36-40. Since prescriptions are orders for purposes of Pennsylvania law,

and Baum's job duties involved obtaining such orders, she qualified for the outside salesperson exemption for this additional reason.

### B. Baum Spent Almost All Of Her Work Time Traveling To And Selling At Physician's Offices

Baum likewise meets the second requirement of the outside salesperson exemption: in making sales and obtaining orders, she was "customarily and regularly engaged more than 80% of work time away from the employer's place or places of business," and, correspondingly, she spent less than 20% of her hours performing non-exempt work – i.e., "work of a nature not directly related to and in conjunction with the making of sales." 34 Pa. Code § 231.85(2). Indeed, Baum easily meets this standard. See 34 Pa. Code § 231.85(2) (providing that "work performed incidental to and in conjunction with an employee's own outside sales or solicitations, including incidental deliveries and collections" constitutes exempt work); see also 29 C.F.R. § 541.503 (2004) (providing that exempt work includes "the writing of his sales reports, the revision of his own catalog, the planning of his itinerary and attendance at sales conferences").

Specifically, Baum conceded that she spent "the vast majority" of her time in the field making calls on doctors. SUF ¶ 21. She testified that her typical work day involved ten to twelve hours per day of field calls and one hour of at-home "computer time." SUF ¶ 56. By her own admission, then, Baum was customarily and regularly on the road significantly more than 80% of her worktime.

Further, while Baum testified that she spent certain time on duties other than sales calls (computer time, completing expense reports, product training, analysis of sales reports), this is all exempt work too because it is "incidental" and performed "in conjunction with" to her outside sales. See 34 Pa. Code § 231.85(2); 29 C.F.R. § 541.503 (2004). For example, Baum's expense reports, which related to her access meals, were plainly incidental to and performed in

-15-

conjunction with sales because Baum used these meals to gain access to physicians and as a vehicle for delivering product information to them. SUF ¶¶ 57, 28-29. Similarly, Baum's product training involved matters such as disease states and drug pathways, topics that she needed to understand in order to communicate effectively with doctors. SUF ¶¶ 15-18. And, as Baum wrote on her resume, she "[a]nalyze[d] reports from headquarters on all products . . . so the territory is able to grow market share or change current strategies." SUF ¶ 58. All of this activity is obviously performed incidental to and in conjunction with Baum's sales work.

In sum, the undisputed evidence in this matter demonstrates that Baum's job duties meet all requirements of Pennsylvania's outside salesperson exemption. For this reason, her overtime claim fails, and this Court should grant AstraZeneca judgment as a matter of law.

## II.     The Administrative Exemption Also Precludes Baum's Claims

Assuming *arguendo* that Baum were correct in her legal contention that she did not engage in "sales" for purposes of Pennsylvania's outside salesperson exemption – although the foregoing demonstrates that Baum's contention is wholly groundless – Baum's claims nevertheless fail because her job duties would qualify for Pennsylvania's administrative exemption. See 43 P.S. § 333.105(5); 34 Pa. Code § 231.83.

Under the applicable short test for this exemption, an exempt administrative employee is one who (1) is "compensated on a salary or fee basis at a rate of not less than $250 per week," (2) has a "primary duty" that "consists of the performance of office or nonmanual work directly related to management policies or general operation of his employer or the customers of the employer" and (3) has a primary duty that "includes work requiring the exercise of discretion and independent judgment." 34 Pa. Code § 231.83(1), (5). Courts have long held that persons who represent their employers in promoting the sale of pharmaceuticals meet these requirements. See, e.g., Cote, 558 F. Supp. at 887 (declaring pharmaceutical detail person to be exempt under

FLSA); Dep't of Labor Wage & Hour Opinion Letter, dated May 19, 1945, Lab. L. Rep. (CCH) Wage & Hour v.1 ¶ 25,210.41 (similar). And Baum plainly meets the requirements here.

### A.    Baum Meets The Salary Test

To begin with, Baum meets the first requirement of the administrative exemption short test because she earned an annual salary of $63,000 per year, which translates to $1,211.54 per week. SUF ¶ 59. This is nearly five times more than the required $250 per week. See 34 Pa. Code § 231.83(5).

### B.    Baum's Primary Duty Was Management or General Business Operations

In addition, to the extent that Baum engaged in promotional work rather than sales, she met the second requirement of Pennsylvania's short test for the administrative exemption because her primary duty "consist[ed] of the performance of office or nonmanual work directly related to management policies or general operation of [her] employer." 34 Pa. Code § 231.83(1). Job activities are so related if they involve "the administrative operations of a business." 29 C.F.R. § 541.205(a) (2004). The "administrative operations of a business," in turn, include work performed by white collar employees who "service" the business by, for example, "representing the company [and] promoting sales." 29 C.F.R. § 541.205(b) (2004). Thus, "promotion men" are a quintessential example of employees who perform work directly related to management policies or general business operations. 29 C.F.R. § 205(c)(5) (2004).

Here, the undisputed evidence demonstrates that Baum's primary duty – the duty that she spent virtually all of her time on – was making calls on physicians. SUF ¶ 21. If, as Baum contends, this duty did not constitute sales work, it certainly involved the exempt administrative tasks of "promoting sales" and "representing the company." Indeed, Baum repeatedly testified that in her position at AstraZeneca she "was responsible for promoting products." SUF ¶ 60; see also SUF ¶ 61 ("We would promote based on the data given to us by the company."); SUF ¶ 62

(testifying that the point of making a "total office" call was to "promote to everyone" in the doctor's office); SUF ¶ 63 (testifying that she used coupons as "another tool I had to try to promote my drug."); SUF ¶ 64 (Baum's original complaint alleged that Baum "spent almost 100% of her time in promoting [AstraZeneca's] products"). "[T]hese are the types of activities contemplated as servicing a business, and thus meet the 'directly related' test." Palacio v. Progressive Ins. Co., 244 F. Supp. 2d 1040, 1047 (C.D. Cal. 2002).

## C.    Baum's Primary Duty Included The Exercise Of Discretion And Independent Judgment

Finally, Baum's job duties meet the short test's third and last requirement that her primary duty "include work requiring the exercise of discretion and independent judgment." 34 Pa. Code § 231.83 (5). This is not a particularly onerous test, and one that, once again, Baum easily meets. See Wolfslayer v. Ikon Office Solutions, Inc., No. 03-6709, 2005 WL 181913 at *10 (E.D. Pa. Jan 26, 2005) (holding that an "employee may be exempt if her job merely 'includes work' requiring discretion and independent judgment" and that the employee need not meet the more rigorous requirement of "'customarily and regularly' exercis[ing] discretion and independent judgment").

Discretion and independent judgment is defined as "the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.207(a)(2004). Further, the term implies that the person "has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." Id. Such decisions may consist of "recommendations for action rather than the actual taking of action." 29 C.F.R. § 541.207(e) (2004) (providing that the "fact that an employee's decisions may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee

is not exercising discretion and independent judgment"). Moreover, the fact that an employee

works in an industry subject to government regulation does not somehow preclude the exercise

of discretion and independent judgment or a finding of exempt status. See, e.g., Renfro v. Ind.

Mich. Power Co., 370 F.3d 512, 519 (6th Cir. 2004) (affirming summary judgment in favor of

the employer, rejecting the plaintiff's argument that "the heavily-regulated nature of their

primary job duty prohibits their exercise of discretion and independent judgment"). Rather, the

central inquiry is whether, within the context of applicable regulations, the employee "actually

exercise[s] discretion and independent judgment." Id.; see also Hogan v. Allstate Ins. Co., 361

F.3d 621, 627 (11th Cir. 2004) ("That [employees'] acts were subject to review, and that they did

not have limitless discretion does not mean [the employer] fails to satisfy this [discretion and

judgment] element.").

In Cote, the U.S. District Court for the Eastern District of Pennsylvania found that the

FLSA's administrative exemption applied to a pharmaceutical company's "detail persons," who

"call regularly on physicians, hospitals, and pharmacies . . . to increase the sale of Burroughs'

products by 'detailing' the recommended indications of these drugs to potential prescribers and

retailers." 558 F. Supp. at 885, 887. The court specifically found that the plaintiffs exercised

sufficient discretion and independent judgment for purposes of the exemption through activities

such as "cultivating a good working relationship with nurses" and "in deciding how to encourage

the use of the product." Id. at 887.

Even more so than the plaintiff in Cote, Baum exercised significant discretion and

independent judgment in multiple areas in performing her primary duty of calling on physicians.

At the outset, she used discretion and independent judgment in gaining access to doctor's offices.

SUF ¶ 25 (Baum testified: "I mean, my skills and abilities were to gain access. I mean, to build

relationships.") For instance, to ensure that she and her co-workers would be able to complete calls, Baum "[c]reated access opportunities for the team by organizing access meals with physicians and <u>used innovative themes to gain access in offices where the physicians were difficult to see.</u>" SUF ¶ 24 (emphasis added); <u>see also</u> SUF ¶ 26.

On calls themselves, Baum could spend anywhere from two minutes to four hours communicating with a physician. SUF ¶¶ 29, 30. The length of calls depended upon, among other things, "[w]hat kind of conversation you are having." SUF ¶ 29. During these interactions, Baum needed to make judgments about how to maintain the doctor's interest and build a relationship, how to most appropriately respond to the doctor's specific needs, how to answer questions, and how to most effectively differentiate AstraZeneca's products from those of the competition. SUF ¶ 25 (noting her skill in "build[ing] relationships"); <u>see also</u> SUF ¶¶ 41-42, 53, 65-66. Baum had to choose what areas of her sales aids to "detail" after listening to a physician's questions, and did not merely repeat the same message on consecutive calls with the same physician. SUF ¶ 42, 66. In her 2003 Performance Plan, Baum stated that she "look[s] at every call as unique." SUF ¶ 67. She continued:

> I am always analyzing every call – what could have worked better and thinking of creative ways to use my resources to differentiate my calls from competitors. It requires constant changing and practicing to achieve customer excellence and to always provide value on every call. This needs to be reassessed after every call and ensure that a need is uncovered.

SUF ¶ 34; <u>see also</u> SUF ¶ 32, 33, 35.

Baum also regularly analyzed prescription data for her territory. She "analyze[d] reports from headquarters on all products and communicate[d] with [her] team so the territory is able to grow market share or change current strategies." SUF ¶ 58; <u>see also</u> SUF ¶ 54 (Baum developed strategies aimed at increasing market share in her territory), SUF ¶ 68 (Baum analyzed territory

and market trends). She did her own market research to figure out what was going on in her territory because she thought that the prescription data provided by the company was unreliable since the company's data did not include figures for some pharmacies, including Wal-Mart. SUF ¶ 69.

Moreover, in performing these functions, Baum was free from immediate supervision. As previously noted, Baum worked out in the field for most of her time, and for the "vast majority" of days in the field she was not accompanied by any manager. SUF ¶ 45. In sum, then, if Baum does not meet the requirements of Pennsylvania's outside sales exemption, she plainly meets all the requirements of the State's administrative exemption. Thus, AstraZeneca is entitled to summary judgment on Baum's claims for this additional reason.

## III. Baum's Claims Are Preempted In All Events

Finally, this Court should dismiss Baum's claims for the independent reason that they are preempted as a matter of law. In this regard, the FLSA's Section 216(b) states that "[n]o employee shall be a party plaintiff to any such [FLSA overtime] action unless he gives his consent in writing to become such a party . . . ." 29 U.S.C. § 216(b). In other words, Section 216(b) disallows representative actions, permitting FLSA overtime claims to proceed on an opt-in basis only. However, the PMWA and WPCL – the overtime statutes under which Baum maintains her claims – contain no such requirement. In fact, the WPCL expressly permits representative actions, see 43 P.S. § 260.9a(b), and Baum herself seeks to pursue her state-law overtime claims as such. But in its well-reasoned decision in Ellis v. Edward D. Jones & Co., 527 F. Supp. 2d 439 (W.D. Pa. 2007), this Court found that the absence of an opt-in requirement in these state wage statutes blocks the accomplishment and execution of the Congressional objectives behind Section 216(b). Because of this, Baum's PMWA and WPCL claims are preempted, and this Court should dismiss her Complaint for this additional reason.

COI-1394880v7

The Supremacy Clause of Article VI of the United States Constitution gives Congress the power to preempt state law. See U.S. Const. art. VI, cl. 2; Nw. Central Pipeline Corp v. State Corp. Comm'n of Kan., 489 U.S. 493, 509 (1989). Under the doctrine of "obstacle preemption," a state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Int'l Paper Co. v. Ouellette, 479 U.S. 481, 492 (1987); see also Fasano v. Fed. Reserve Bank of N.Y., 457 F.3d 274, 280 (3rd Cir. 2006) (holding state laws are preempted if they "stand[] as an obstacle to the accomplishment and execution of full purposes and objectives of Congress") (internal citations omitted); Mt. Olivet Cemetery Ass'n v. Salt Lake City, 164 F.3d 480, 489 (10th Cir. 1998) (stating that obstacle preemption applies when state law "thwart[s] the federal policy in a material way"). Similarly, a state law is preempted if it "it interferes with the methods by which the federal statute was designed to reach this goal." Ouellette, 479 U.S. at 490; see also Mich. Canners & Freezers Assn. v. Agric. Marketing & Bargaining Bd., 467 U.S. 461, 477 (1984).

In accordance with these principles, the Supreme Court has applied obstacle preemption in a variety of contexts. See, e.g., Geier v. Am. Honda Motor Co., Inc., 529 U.S. 861, 863 (2000) (holding that an automobile air bag requirement "presented an obstacle to the variety and mix of devices that the federal regulation sought" and "could have made less likely the adoption of a state mandatory 'buckle-up' law"); Boggs v. Boggs, 520 U.S. 833 (1997) (providing that a state community property law that interfered with objectives of ERISA was preempted based on obstacle preemption); Ouellette, 479 U.S. 499-500 (stating that a nuisance law that had the potential to undermine regulatory structure and objectives of the Clean Water Act was preempted based on obstacle preemption).

COI-1394880v7

Similarly, the Third Circuit has preempted state statutes that, in the face of a carefully crafted federal statutory structure, purport to "impose substantive and procedural burdens well beyond those of federal law" and thereby "frustrate Congressional intent." Fasano, 457 F.3d at 287 (holding that, as applied to the Federal Reserve Banks, state discrimination laws were preempted to the extent that they imposed "additional remedies or liability beyond the federal antidiscrimination laws" incorporated into the Federal Reserve Act); see also Bernhardt v. Los Angeles County, 339 F.3d 920, 930 (9th Cir. 2003) ("County policy that requires the waiver of statutory attorney's fees in all civil rights cases . . . may unduly interfere with the method – i.e., the availability of statutory attorney's fees – that Congress has chosen to encourage representation of individuals whose civil rights have been violated, and thereby violate the Supremacy Clause"); Resolution Trust Corp. v. Diamond, 45 F.3d 665, 675 (2nd Cir. 1995) (holding that anti-eviction provisions of New York's rent regulations interfere with the operation of 12 U.S.C. § 1821(e), which permitted the plaintiff to repudiate leases).

Here, the Court should apply the doctrine of obstacle preemption and dismiss with prejudice Baum's state law claims. As noted, Section 216(b) provides that FLSA minimum wage or overtime actions may be maintained on an opt-in basis only. And, in Ellis, this Court determined that Congress' objective in enacting Section 216(b) was to "limit private FLSA claims to those affirmatively asserted by affected employees 'in their own right' and to 'free[] employers of the burden of representative actions.'" Ellis, 527 F. Supp. 2d at 451 (quoting Hoffman-La Roche v. Sperling, 493 U.S. 165, 173 (1989)). The PMWA and WPCL, on the other hand, permit representative overtime actions. As this Court stated in Ellis, allowing plaintiffs to "circumvent the [FLSA] opt-in requirement" by asserting representative overtime actions under the PMWA and WPCL would "essentially nullify Congress' intent in crafting

-23-

Section 216(b) and eviscerate the purpose of Section 216(b)'s opt-in requirement." Id. at 452 (internal citations omitted); see also Fasano, 457 F.3d at 283 (preempting state provision that "frustrate[d] Congressional intent" by "impos[ing] substantive and procedural burdens well beyond those imposed by federal law") (emphasis added). The result for Baum is that her state law claims (regardless of whether they are asserted in federal or state court) must be dismissed as preempted by the FLSA. Indeed, preemption of these claims is the logical extension of this Court's holding in Ellis; otherwise plaintiffs could compromise employers' and absent class members' rights by simply filing in state court and (to the extent possible) avoiding federal diversity jurisdiction.

Moreover, Baum's claims are not immune from preemption under the FLSA's limited savings clause, which provides only that states may "establish[] a minimum wage higher than the minimum wage established under this chapter or a maximum work week lower than the maximum workweek established under this chapter." 29 U.S.C. § 218(a) (emphasis added). As this Court again found in Ellis, this is a narrow provision that does not save claims falling outside of its limited scope. See Ellis, 527 F. Supp. 2d at 450-51. Pointedly, it "should not be read to obviate FLSA's preemptive implications," since such a narrow clause "does not bar the ordinary working of conflict pre-emption principles." Id.; see also Frank v. Delta Airlines Inc., 314 F.3d 195, 200 (5th Cir. 2002) (noting federal statute and regulations that "each contain[] a single savings clause that exempts only state criminal laws from preemption, implying that state law claims are otherwise broadly preempted") (emphasis added); People of the State of Ill. v. City of Milwaukee, 731 F.2d 403, 413 (7th Cir. 1984) (narrowly construing savings clause in Federal Water Pollution Control Act because "Congress intended no more than to save the right and jurisdiction of a state to regulate activity occurring within the confines of its boundary waters")

(emphasis added); Nat'l Ass'n of Regulatory Utilities Comm'rs of Coleman, 542 F.2d 11, 13-15 (3d Cir. 1976) (narrowly construing savings clause in Federal Railroad Safety Act); Goldman v. Hartford Life and Accident Ins. Co., No. 03-759, 2004 WL 1934986, at *2 (E.D. La. Aug. 31, 2004) (correlating ERISA's "narrow savings clause" to broad pre-emption).

Here, Baum's claims do not fall within either of the two discrete categories that are covered by the FLSA's narrow saving clause. See Ellis, 527 F. Supp. 2d at 450-51. Specifically, Baum does not, and cannot, contend that Pennsylvania's 40-hour workweek, see 34 Pa. Code § 231.41, is "lower than the maximum workweek established" by Congress in the FLSA. See 29 U.S.C. § 218(a). Further, although Pennsylvania has a higher minimum wage ($7.15) than the federal standard ($5.85), Baum does not allege anywhere in the Complaint (and the facts do not support) a claim that she was paid less than the Pennsylvania minimum wage. Because "Congress intended no more than to save" discrete claims that Baum does not allege, and because the PMWA and WPCL stand as an obstacle to central tenants of FLSA law, the FLSA preempts her state law claims, which must be dismissed with prejudice. People of the State of Ill., 731 F.2d at 413-14; Ellis, 527 F. Supp. 2d at 450-452.

## CONCLUSION

For the foregoing reasons, this Court should grant AstraZeneca's Motion, and it should dismiss Baum's Complaint in its entirety.

COI-1394880v7

Dated: March 28, 2008

Respectfully submitted,

s/ James S. Urban

James S. Urban
jsurban@jonesday.com
Pa. Bar No. 82019
JONES DAY
500 Grant Street, Suite 3100
Pittsburgh, PA  15219-2502
Telephone:  (412) 391-3939
Facsimile:  (412) 394-7959

Matthew W. Lampe (admitted *pro hac vice*)
mwlampe@jonesday.com
JONES DAY
222 East 41st Street
New York, New York  10017-6702
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
*Not Admitted In New York*

Harry I. Johnson, III. (admitted *pro hac vice*)
harryjohnson@jonesday.com
JONES DAY 555
South Flower Street, 50th Floor
Los Angeles, CA 90071-2300
Telephone: (213) 489-3939
Facsimile: (213) 243-2539

Theresia M. Mosier (admitted *pro hac vice*)
tmoser@jonesday.com
JONES DAY
1429 Peachtree Street, N.E., Suite 800
Atlanta, GA 30309-3053
Telephone: (404) 521-3939
Facsimile: (404) 581-8330

Counsel for Defendant AstraZeneca LP