## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KRISTIN BAUM, on behalf of herself and )
others similarly situated, )
                                   )
             Plaintiff, )
                                     )      CIVIL ACTION NO. 3:2007-cv-90
     v. )
                                       )      JUDGE KIM R. GIBSON
                                       )
ASTRAZENECA LP )
                                     )
             Defendants. )

# **MEMORANDUM OPINION and ORDER**

Plaintiff Kristin Baum seeks damages from Defendant AstraZeneca LP for alleged violations of Pennsylvania law that requires overtime pay for non-exempt employees. Ms. Baum, a pharmaceutical sales representative, argues that AstraZeneca improperly treated her position as exempt from Pennsylvania's wage and hour laws. AstraZeneca disagrees, arguing that the job tasks performed by Ms. Baum fall within the statutory exemption for outside sales work. In addition to seeking resolution of her own claim, Ms. Baum also seeks to act as representative for a class of individuals whom she alleges are similarly situated.

This matter comes before the Court on Defendant Astrazeneca LP's "Motion for Summary Judgment Seeking Dismissal With Prejudice of Plaintiff Baum's Claims" (Doc. No. 52). AstraZeneca asserts three grounds for why it should be granted summary judgment: first, that Ms. Baum is exempt from the overtime pay regulations under the outside salesperson exemption; second, in the alternative, that Ms. Baum is exempt from the overtime pay regulations under the administrative exemption; and third, also alternatively, that Ms. Baum's claims are preempted by federal law. Ms. Baum disputes each of these grounds, arguing that

AstraZeneca's Motion must be denied because she did not sell anything for AstraZeneca, her duties do not qualify her for the administrative exemption, and that preemption is not appropriate. Ms. Baum asserts that since she should not have been classified as exempt, and because she frequently worked more than 40 hours per week, she is entitled to appropriate back-pay damages.

For the reasons set forth below, Defendant's Motion for Summary Judgment is granted, and the remaining pending motions in this matter (Doc. Nos. 19, 49, and 69) are accordingly denied as moot.

## I. PROCEDURAL HISTORY AND FACTUAL BACKGROUND[1]

On March 27, 2007, Plaintiff Baum filed a lawsuit in the Court of Common Pleas of Westmoreland County, Pennsylvania. On April 20, 2009, AstraZeneca removed the action to this Court. The Court has jurisdiction over the claims in this matter pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2). While both parties have filed numerous other pretrial motions, the Court now considers AstraZeneca's Motion for Summary Judgment.

AstraZeneca researches, develops, manufactures, and sells pharmaceuticals. Doc. Nos. 53 and 63, ¶ 1. AstraZeneca employs numerous individuals carrying the title "Pharmaceutical Sales Specialist" (hereinafter "PSS"). *Id.* ¶ 2. AstraZeneca hired Ms. Baum on April 13, 1998. *Id.* ¶ 3. Ms. Baum worked in various non-sales positions during her first four years with AstraZeneca. *Id.* ¶ 4. Having initially pursued the PSS position because she "always wanted to

---

[1]The facts are taken from the documentary evidence and memoranda submitted to the Court, and are considered in the light most favorable to Ms. Baum, the non-movingparty. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Any proposed facts not contained within this recitation of facts were found by the Court to be immaterial or disputed.

2

be in sales," Ms. Baum worked as a PSS from May 1, 2003 to November 1, 2006. *Id.* ¶ 5. She worked first on AstraZeneca's respiratory team and later on the cardiovascular team. *Id.* ¶ 7. Working with a small team of other PSS's, Ms. Baum was responsible for numerous AstraZeneca pharmaceuticals. *Id.* ¶¶ 8-9.

AstraZeneca provided Ms. Baum with training on its products and selling philosophy, known as "Interactive Strategic Selling" ("ISS). *Id.* ¶¶ 10-11. Ms. Baum generally followed the ISS model in interacting with physicians. *Id.* ¶ 12. As part of Ms. Baum's initial training, she engaged in role-playing to simulate future interactions with physicians; furthermore, she initially received field training by accompanying more experienced PSS's. *Id.* ¶¶ 13-14. Ms. Baum also received ongoing computer-based product training. *Id.* ¶ 15.

Because her job required fluency in the sophisticated vocabulary and processes of pharmaceuticals and drug delivery, including an understanding of medical terms, disease states and drug pathways, Ms. Baum enrolled in outside classes to obtain additional relevant knowledge. *Id.* ¶¶ 16-17. She exerted substantial efforts to learn about pharmaceuticals, because she "need[ed] to know [her] products inside and out." *Id.* ¶ 17. Ms. Baum once gave a training presentation at an Astrazeneca district meeting about a clinical study involving Crestor. *Id.* ¶ 18.

Ms. Baum's purpose in her job as a PSS was to increase Astrazeneca's market share "through personal selling" to physicians. *Id.* ¶ 19. In 2006, during a time period in which Ms. Baum worked as a PSS, one computational measure for AstraZeneca's market share for Crestor increased by three percent. *Id.* ¶ 20. Ms. Baum spent the "vast majority" of each work day in the field, making calls upon physicians. *Id.* ¶ 21. Ms. Baum and AstraZeneca referred to physicians as "customers." *Id.* ¶ 23.

3

Ms. Baum used her skills and abilities in creative manners to gain access to busy physicians and build relationships with them. *Id.* ¶¶ 24-25. She frequently scheduled sponsored meals, termed "access meals", which were used to build relationships with physicians and promote AstraZeneca's products. *Id.* ¶¶ 24-28. Both access meals and typical in-office sales calls varied in length, depending upon the circumstances. *Id.* ¶¶ 29-30. Generally, Ms. Baum's in-office sales calls were quite short. *Id.* ¶ 30. She testified that she had "good access" to doctors. *Id.* ¶ 31.

Ms. Baum utilized AstraZeneca's ISS selling model with audience physicians, and adjusted her technique depending on the particular physician. *Id.* ¶ 32. Portions of Ms. Baum's pitches were based upon scripts provided by AstraZeneca, and certain physician questions passed through her to be answered by AstraZeneca's central office. *Id.* ¶¶ 32-36. Ms. Baum conducted various methods of self-critique in order to improve her efforts. *Id.* She also used a variety of personal relations tactics, including providing food, coupons and samples. *Id.* Ms. Baum's ultimate purpose in visiting the physician was to convey the strengths of AstraZeneca's products and persuade physicians to write prescriptions for AstraZeneca products. *Id.* ¶¶ 36-37. As part of this central purpose, she typically concluded her meetings with physicians by directly asking them for commitments to write prescriptions for AstraZeneca products in appropriate circumstances. *Id.* ¶¶ 38-39.

Ms. Baum utilized various AstraZeneca-approved sales aids while calling upon physicians, including core visual aids, clinical studies, and package inserts. *Id.* ¶ 41. She exercised discretion in selecting which portions of the approved AstraZeneca materials were appropriate to discuss with the doctor. *Id.* ¶ 42.

4

As an additional part of her promotional efforts, Ms. Baum organized and attended programs featuring knowledgeable speakers who were appealing to physicians. *Id.* ¶¶ 43-44.

Ms. Baum worked in the field alone most of her time; she was expected to work during all regular work hours, and was required to notify the manager upon any need for leave. *Id.* ¶ 45. AstraZeneca required that she maintain a strict regimen in relation to notekeeping, and checking voice messages and emails. *Id.* Furthermore, AstraZeneca's district sales manager tracked Ms. Baum's daily activities; the manager also accompanied her on calls approximately once every one to two months. *Id.* ¶¶ 45-46. Following such accompanied visits, Ms. Baum's manager reviewed her performance, assessing her selling abilities under the ISS model. *Id.* ¶¶ 47-48. Such performance reviews were considered in promotion decisions, and a portion of Baum's compensation was tied to various AstraZeneca sales targets and market share computations. *Id.* ¶¶ 49-50.

Ms. Baum herself considered her PSS job as a sales job. *Id.* ¶ 51. She described her job strategy as focused upon "clinical selling that show the advantage of our products to the competitors . . . ." *Id.* ¶ 52.

Ms. Baum spent ninety percent of each work day making calls in the field. *Id.* ¶ 56. A typical day included ten to twelve hours in the field, with one hour of "computer time" at home. *Id.* Her expense reports included access meals and programs planned and conducted by her. *Id.* ¶ 57. Her resume describes one of her job duties as follows: "Analyze reports from headquarters on all products and communicate with the team so the territory is able to grow market share or change current strategies." *Id.* ¶ 58.

Ms. Baum earned an annual salary of $63,000 per year. *Id.* ¶ 59. She characterized her primary duty as a PSS as promoting AstraZeneca products. *Id.* ¶ 60. She utilized various

methods of promotion during her visits to physicians, including explaining company-provided data and providing coupons and samples. *Id.* ¶¶ 61-64.

Defendant argues that Ms. Baum exercised substantial judgment and discretion while discussing pharmaceutical products with physicians; Plaintiff argues that "Baum gave the same canned speech to each physician." *Id.* ¶ 65. AstraZeneca's ISS model called for a "dialogue, not only a presentation." *Id.* ¶ 66. Ms. Baum analyzed territory and market trends, using both company-provided data, and information culled from her own interactions with physicians. *Id.* ¶¶ 68-69.

## II. STANDARD OF REVIEW

A court should grant summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Troy Chem. Corp., v. Teamsters Union Local No. 408*, 37 F.3d 123, 125-26 (3d Cir. 1994). In deciding a summary judgment motion, a court must "view the evidence . . . through the prism of the substantive evidentiary burden" to determine "whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of the evidence required by the governing law or that he did not." *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986)). A court considers only admissible evidence and admissions. *See* Fed. R. Civ. P. 56(e)1 and 36.

Essentially, summary judgment is appropriate only where a trial is not needed to resolve any genuine disputes of material facts. 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2728 (2008). An issue of material fact is genuine "if the evidence is

6

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S. Ct. at 2510, 91 L. Ed. 2d at 211 (1986). The Supreme Court further explained: "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538, 552 (1986)(internal citation omitted). Even where a moving party seems to have discharged its burden, a court retains discretion to deny a motion for summary judgment. 10A FPP § 2728.

## III. PENNSYLVANIA WAGE LAWS AND RELATION TO FLSA

This action was brought pursuant to the Pennsylvania Minimum Wage Act ("PMWA"), 33 Pa. Cons. Stat. §§ 333.104. In many respects, the PMWA mirrors the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201-219 (FLSA). *See Commonwealth of Penn. v. Dept. of Labor*, 822 A.2d 870, 873 (Pa. Commonw. Ct. 2003). Furthermore, Pennsylvania courts have indicated that it may be proper to interpret the PMWA in light of federal interpretation of the FLSA, given the substantial similarity. *See, e.g.*, *Commonwealth v. Penn. Labor Relations Bd.*, 527 A. 2d 1097 (Pa. Commonw. Ct. 1987).

Congress enacted the FLSA in 1938 to protect certain covered workers from "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." *See* 29 U.S.C. § 202(a); *see also Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739, 101 S. Ct. 1437, 1444, 67 L.

7

Ed. 2d 641 (1981) ("[T]he FLSA was designed to give specific minimum protections to *individual* workers and to ensure that *each* employee covered by the Act would receive "'[a] fair day's pay for a fair day's work' " and would be protected from "the evil of 'overwork' as well as 'underpay.'") (quoting *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 578, 62 S. Ct. 1216, 1220, 86 L. Ed. 1682 (1942)) (emphasis in original). As evident from exemptions drafted into the FLSA over the years, Congress does not intend to protect all workers in an equal fashion. See *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706, 65 S. Ct. 895, 902, 89 L. Ed. 1296 (1945) ("The legislative history of the Fair Labor Standards Act shows an intent on the part of Congress to protect certain groups of the population from substandard wages and excessive hours which endangered the national health and well-being and the free flow of goods in interstate commerce."); *see also Biggs v. Wilson*, 828 F. Supp. 774, 777 (E.D. Cal. 1991) ("The FLSA was intended to protect the worker whom Congress regarded as having unequal bargaining power.")

Both the FLSA and the Pennsylvania Act establish requirements that workers must be paid overtime wages for hours worked in excess of forty per week. 43 P.S. § 333.104(c); 29 U.S.C. § 207(a)(1). Additionally, both bodies of law contain extremely similar outside sales and administrative exemptions, which will be discussed *infra*. In 2004, the Department of Labor explained that such exemptions were premised on the idea that such workers typically earned high salaries and other compensation, and the type of work performed was difficult to standardize to a set time frame, or spread to other workers.[2]

---

[2]Dep't. of Labor, Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees, 69 Fed. Reg. 22122, 22123-24 (Apr. 23, 2004).

Because the FLSA is a remedial act, its exemptions are typically narrowly construed. *See Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S. Ct. 453, 456, 4 L. Ed. 2d 393 (1960) ("We have held that these exemptions are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit."). Furthermore, the employer bears the burden of proving that its employees fit within an exemption. *Friedrich v. U.S. Computer Servs.*, 974 F.2d 409, 412 (3d Cir. 1992) ("It is the employer's burden to affirmatively prove that its employees come within the scope of the overtime exemption, and any exemption from the Act must be proven plainly and unmistakably.") (citing *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 900 (3d Cir.1991)).

## A. Outside Sales Exemption

Under both the FLSA[3] and the PMWA, "outside salesmen"[4] are exempt from overtime provisions. 43 Pa. Cons. Stat. § 333.105(a)(5) provides:

> (5) In a bona fide executive, administrative, or professional capacity (including any employe employed in the capacity of academic administrative personnel o r teacher in elementary or secondary schools) or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the secretary, except that an employe of a retail or service establishment shall not be excluded from the definition of employe employed in a bona fide executive or administrative capacity because of the number of hours in his or her workweek which he or she devotes to activities not directly or closely related to the performance of executive administrative activities, if less

---

[3]29 U.S.C. § 213(a)(1), as defined in 29 C.F.R. § 541.500, *et seq.*

[4]In light of the dated language used in the Pennsylvania statute and regulation, the Court in its discussion elects to use the more modern term "salesperson" in place of "salesman."

9

than forty percent of his or her hours worked in the workweek are devoted to such activities);

Pursuant to the grant of authority of 43 Pa. Cons. Stat. § 333.105(a)(5), the term "outside salesman" is defined in Pennsylvania's code of regulations:

> Outside salesman means an employee who is employed for the purpose of and who is customarily and regularly engaged more than 80% of work time away from the employer's place or places of business in the following manner:
>
> > (1) Making sales, including any sale, exchange, contract to sell, consignment for sale, or other disposition or selling, and delivering articles or goods.
> >
> > (2) Obtaining orders or contracts for the use of facilities for which a consideration will be paid by the client or customer. In addition, the employee may not spend more than 20% of the hours worked in any week in work of a nature not directly related to and in conjunction with the making of sales; provided however, that work performed incidental and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall be not regarded as nonexempt work.

34 Pa. Code § 231.85.

## B. Administrative Exemption

Both Pennsylvania law and the FLSA[5] exempt employees employed in certain administrative capacities. Under Pennsylvania law, an exempt employee is one who meets the following criteria: (1) is "compensated on a salary or fee basis at a rate of not less than $250 per week"; (2) has a "primary duty", meaning in part that at least 80% of time is spent in such

---

[5] 29 U.S.C. § 213(a)(1).

work, that "consists of the performance of office or nonmanual work directly related to management policies or general operation of his employer or the customers of the employer" (3) has a primary duty that "includes work requiring the exercise of discretion and independent judgment." *See* 34 Pa. Code § 231.83.

## IV. DISCUSSION

### A. Ms. Baum was Properly Classified as an Exempt Outside Salesperson

The first issue before the Court is whether Ms. Baum was properly classified as an exempt outside salesperson. Ms. Baum emphasizes that given the Court's duty to construe the exemption narrowly, she does not fit clearly and unmistakably within the exemption's terms. However, upon a straightforward construction of the statute and the subsequent assessment of the undisputed facts, the Court finds that AstraZeneca meets its burden in showing that Ms. Baum falls within the exemption. Importantly, classifying Ms. Baum as exempt comports with the function, purpose and spirit of Pennsylvania's wage and labor laws.

From the plain language of the Pennsylvania definition of outside salesperson, three simple requirements emerge that are relevant to the matter at hand: 1) that the employee is employed for the purpose of "[m]aking sales" or "obtaining orders"; and 2) that the employee is "customarily and regularly engaged more than 80% of work time away from employer's place or places of business" in making sales; and 3) that the employee not spend more than "20% of the hours worked in any week in work of a nature not directly related to and in conjunction with the making of sales." *Id.* Of particular note is the language that follows "making sales": "including any sale, exchange, contract to sell, consignment for sale, or other disposition or

11

selling, and delivering articles or goods." 34 Pa. Code § 231.85. The language of the Pennsylvania regulation is substantially similar to the federal regulations defining "sales" and "obtaining orders." 29 C.F.R. § 541.501(b)-(c).

In construing such statutory and regulatory language, the Court first considers the plain meaning of the language to the extent possible. *Caminetti v. U.S.*, 242 U.S. 470 (1917) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain . . . the sole function of the courts is to enforce it according to its terms."). This Court remains cognizant of its responsibility to employ common sense in interpreting statutory language, meaning that refusing to appreciate the social goals of the legislation, or the problem the statute was intended to address, would inappropriately ignore and defeat the spirit of these laws. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 586, 103 S.Ct. 2017, 2025, 76 L. Ed. 2d 157 (1983) (discussing the importance, in certain situations, of considering the purpose of the statute).

### 1. Ms. Baum Actually Made Sales or Obtained Orders, and was Employed for the Purpose of Making Sales and Obtaining Orders

From the Court's perspective, while the parties draw differing legal conclusions, they do not appear to dispute the bare facts of Ms. Baum's actual working responsibilities and activities.[6] These undisputed facts[7] portray an employee who, while trained by corporate

---

[6]Rather than presenting details or facts that depict her work responsibilities, Ms. Baum instead primarily utilized her Counter Statement of Facts to cloak legal arguments regarding the proper definition of "sales" in the guise of factual characterizations.

[7]Of course, at the summary judgment stage, much of the Court's fact-finding responsibilities are drastically limited; however, even such limited fact-finding responsibilities are essentially unnecessary due to the parties' admissions; therefore, this Court will dive directly into the word battle, as framed and laid out by Ms. Baum.

12

managers and provided with corporate materials, nonetheless exhibited substantial independence and creativity in conducting her daily pursuits.

Ms. Baum's filings essentially argue that she was employed merely to feed, entertain and inform physicians, and therefore was not employed for the purpose of making sales or obtaining orders. She argues that her job was in the nature of non-exempt promotional work only. In response, AstraZeneca characterizes Ms. Baum's contentions as counterintuitive, arguing that all PSS's, including Ms. Baum, were obviously employed for the purpose of making sales.

### a. Appropriate Definition of Sales as Understood within the Singular Pharmaceutical Industry

Prior to a determination of whether Ms. Baum was employed for the purpose of making sales, the Court first finds it necessary to consider the term "sale" and determine whether Ms. Baum made sales.[8]

First, this Court believes that the term "sale" can only be defined and considered in a manner that remains cognizant of practices within a particular industry. *See In re Novartis Wage and Hour Lit*, 593 F. Supp. 2d 637, 649, 653 (S.D.N.Y. 2009) (explaining that courts have properly "taken into account the characteristics of the industry in question when determining the applicability of the outside sales exemption" and "recognizing the realities of

---

[8]Plaintiff urges upon the Court certain definitions of the term "sale" that have been put forth in explanations and statements by the federal Department of Labor; in particular, the Department of Labor has presented certain examples in an attempt to assist distinguishing exempt sales work from non-exempt promotional work. As mentioned, because the Pennsylvania Act is modeled upon the FLSA, such material may be treated by Pennsylvania Courts as significant and persuasive. However, because this Court is not interpreting or construing the FLSA, there is no need to depend fully upon the Department of Labor's statements, especially given the Court's perspective that such statements, while intended to properly describe the statute, and clarify boundary lines for purposes of providing notice, markedly fail to accomplish such goals, as illustrated by this litigation.

the pharmaceutical industry is not incompatible with engaging in a narrow reading"). Such an effort is not back-fitting a statutory regime to an industry, but rather employing common sense in applying broad statutory language to a specific case and controversy. The precise contours of a "sale" naturally differ across industries, markets, and even cultures. Therefore, the Court begins its construction of the Pennsylvania statute and regulation, and the term "sale", with a necessary prefatory discussion of the pharmaceutical industry.

Obviously, the pharmaceutical industry is heavily regulated.[9] Of primary importance within this regulatory system is the Food and Drug Administration, which classifies all pharmaceuticals. *See* O'Reilly, *Food and Drug Administration* §§ 18:9 to 18:16 (3d ed. 2008). Pursuant to this regime, patients are not allowed to purchase certain pharmaceuticals directly from pharmaceutical companies. Instead, the patient obtains a prescription for a particular pharmaceutical from her physician, and ultimately purchases the pharmaceutical from a pharmacist.

Under such a framework, the question naturally arises as to when or how a sale occurs. Does a sale occur only when the patient actually obtains the drug from the pharmacist? Or does a sale occur when a physician resolves in his mind to prescribe a certain pharmaceutical to future patients with a certain set of symptoms? What if the doctor never treats a patient fitting this criteria? What if the patient never actually fulfills the prescription?

---

[9]The basics of this country's system of pharmaceutical regulation, at least in terms of its impact upon access to prescription drugs, are fairly well-understood by all in our society, given the need for nearly all of us to navigate this system on a regular basis; therefore, much of the discussion about such basics will proceed without distracting and ultimately unnecessary citations. Where the Court believes that a particular issue may not be obvious, a citation to a potentially helpful source will be included.

Leaving aside such questions for the moment, the Court first considers the issue of sales from the perspective of a pharmaceutical company. In the above simplified framework, a company seeking to increase sales may exert pressure upon essentially two levers: the actual patient, and the prescribing physician. In what is a relatively recent development, some pharmaceutical companies run mass-market advertisements directed at consumers.[10] The purpose of such advertisements is simple: to impress upon consumers that a particular pharmaceutical may be appropriate for their use, thus encouraging them to query their personal physicians about prescribing that pharmaceutical. Second, and more traditionally, a pharmaceutical company advertises directly to the gatekeeper physician; by impressing upon that physician the positive attributes of the pharmaceutical, the company may reasonably expect an increase in eventual pharmaceutical sales.

For decades, the pharmaceutical industry has invested substantial amounts of money in its sales forces, consisting of well-paid individuals who visit physicians and personally advocate the virtues and values of certain pharmaceuticals; such efforts have been viewed as effective.[11] The motivation for organizing the sales forces in this way followed from not only the delivery mechanism inherent in pharmaceutical sales, but also the culture and ethics of the health services industry. Consequently, the Court believes that a rudimentary examination of this culture, including two broad conceptual categories described by legal scholars within the field, is necessary prior to probing the more fundamental question of sales within the industry.

---

[10]*See* Wilkes, Bell and Kravitz, *Direct-to-Consumer Prescription Drug Advertising: Trends, Impacts, and Implications*, 19 Health Affairs 2, 110-128 (2000).

[11]*See generally IMS Health, Inc. v. Ayotte*, 550 F.3d 42, 56 (1st Cir. 2008) (discussing the evident efficacy of "detailers" or pharmaceutical sales representatives).

First, as is perhaps obvious to all, pharmaceutical sales, and indeed all medical services, simply do not function as a typical market. Aspects of this market failure are inevitable given the nature of the industry; however, part of the market failure may also be trace d to the professional culture of physicians. Numerous theorists believe that physicians operate under what is aptly described as the professional paradigm.[12] Under this professional paradigm, regulation and professional ethics act as a substitute or replacement for a typical free market.[13] The professional model dictates that physicians should operate as substitute decision makers, rather than sources of advice and information.[14] Additionally, such decisions were made solely upon the basis of the inerrant and unbiased revelations of science.[15] Upon this justification of possessing knowledge inaccessible to lay-people, doctors control nearly all relevant decision-making in terms of access to medical services.[16]

This role of doctors as substitute decision-makers emerged concomitant to the belief that patients themselves are incapable of understanding sufficient information to make intelligent medical decisions.[17] In other words, the information asymmetry between physician and patient

[12]*See, e.g.*, Clark C. Havighurst, *The Professional Paradigm of Medical Care: Obstacle to Decentralization*, 30 Jurimetrics J. 415, 419-21 (1990).

[13]*See* James F. Blumstein, *Health Care Law and Policy: Whence and Whither*, 14 Health-Matrix: Journal of Law-Medicine 35, 38 (2004)("The professional model takes as its premise that, empirically, the economic marketplace does not and cannot function properly in the healthcare field, and, normatively, that it should not so function.").

[14]*Id.*

[15]*See, e.g.*, James F. Blumstein, *Health Care Reform and Competing Visions of Medical Care: Antitrust and State Provider Cooperation Legislation*, 79 Cornell L. Rev. 1459, 1466 (1994).

[16]*Id.* at 38-39.

[17]*Id.* ("[P]atients are not well informed about the technically complex dimensions of medical care and are not really capable of becoming adequately informed so as to exercise control as they would in a typical market-based context.).

is simply a bridge too far: because only physicians have the extensive required scientific knowledge and training to make informed health care choices, they alone must make medical decisions, as patients simply could not possibly make wise decisions for themselves. This pure professional paradigm empowers physicians and subordinates individual consumer preference and choice.

Another model for describing health services delivery is the market or economic paradigm. In recent years, in medical practice, this market paradigm has made some inroads against the pure professional paradigm, in part in response to extreme cost escalation, developments in antitrust law, and mounting empirical evidence that economic incentives materially affect the putatively neutral decisions of professional physician.[18] This movement, while generally calling for the introduction of economic decisions and cost-benefit analyses,[19] also pushes back on the profession model by arguing that patients themselves can and should ultimately control the decision-making process with respect to their medical treatment.[20] Thus, the market paradigm suggests that physicians, rather than being substitute decision-makers, should instead inform and educate patients. Under this model, physician and customer work

---

[18]*See generally* Rand E. Rosenblatt, *The Four Ages of Health Law*, 14 Health Matrix: Journal of Law-Medicine 155 (2004) (describing the nature and influence of various philosophical models, including the professional and market paradigms, that shape health care law and delivery).

[19]*See* James F. Blumstein, *Medicine Isn't an Economics-Free Zone*, Wall St. J., June 22, 2001, at A14.

[20]James. F. Blumstein, *Health Care Reform and Competing Visions of Medical Care: Antitrust and State Provider Cooperation Legislation*, 79 Cornell L. Rev. 1459, 1475 (explaining that "as the degree of disclosure expands, patient autonomy and empowerment increase.")

together in shared decision-making about treatment plans.[21]  A court's understanding of or disposition toward the assumptions and philosophies behind these frameworks is significant.[22]

This simplified discussion of these broad descriptive theories underlying health services, and the awareness of the likely influence of these descriptive norms upon pharmaceutical sales, assists the Court in answering its previously formulated question as to when a "sale" occurs in the pharmaceutical industry.  Significantly, the Court believes that the professional paradigm still accurately describes much of the actual practices of the health services industry.

Therefore, for reasons both cultural and regulatory, a pharmaceutical salesperson simply cannot go door-to-door through neighborhoods carrying a briefcase full of Levitra.  Instead, the pharmaceutical salesperson must approach the person with the decision-making power: under the professional paradigm, that person is always the physician.  Even under the more modern, market-oriented paradigm, the physician still wields substantial control and influence over the patient's choice.  In most instances, the physician likely remains a substitute decision-maker; in other instances, at the very least, the physician retains influence and partial control as a necessary limb in a shared decision-making process.

The Court now returns to the definition of "sale", and the somewhat related question of when a sale actually occurs.  Obviously, a pharmaceutical sale is not exactly final until the patient herself completes a transaction by taking the physician permission slip (prescription) to

---

[21]*Id.* at n. 68.

[22]*Compare Pegrom v. Herdrich*, 154 F.3d 362, 374-80 (7th Cir. 1998) (warning of the dangers and problems associated with allowing economic factors to influence medical decision-making), with *Pegrom v. Herdrich*, 530 U.S. 211, 236-37, 120 S. Ct. 2143, 2158, 147 L. Ed. 2d 164 (2000) (reversing the Seventh Circuit decision while acknowledging the significance of market-oriented health care reforms).

a pharmacist for completion of the sale.[23] However, the statutory language does not require a final sale, complete and consummated. Thus, pursuant to the above industry specifics, the Court believes that a "sale" may be defined as substantially occurring at the moment a physician commits to prescribing a particular pharmaceutical when treating a particular patient. In *Clements v. Serco*, in considering this question under the FLSA, the Tenth Circuit explained: "the touchstone for making a sale, under the Federal Regulations, is obtaining a commitment." 530 F.3d 1224, 1227 (10th Cir. 2008). Importantly, the facts of the case *sub judice* illustrate that the PSS's were trained and employed for the purpose of obtaining a commitment, which is the "touchstone" for making a sale.[24]

The Court concludes that in the pharmaceutical industry, the strongest evidence for sales activity and being employed for the purpose of making sales, is that the employee obtains commitments from physicians. Ms. Baum did precisely that: after carefully preparation and planning, she skillfully asked physicians for commitments to prescribe AstraZeneca products in appropriate situations. The capacity of a salesperson to obtain such commitments, in any field, is rare, and consequently well-compensated by private industry; the effort and charisma required to successfully close, as will be discussed *infra*, is a hallmark of professional sales activity.

---

[23]And frankly, this whole story could become even more contrived if the Court chose to dive into the bizarre world of medical insurance and third-party payment; perhaps the attorneys in this matter missed some fascinatingly obtuse arguments as to whether a consumer is even a consumer a third-party payeris ultimately the responsible fiscal engine behind the sales transaction.

[24]In this matter, the Court does not extensively analyze the numerous relevant federal administrative regulations and related statements; nonetheless, such regulations and commentary have been considered by the Court.

Consequently, the Court holds that in the pharmaceutical context, given the realities of the professional paradigm, a sale occurs when a physician commits to prescribe a certain product in a certain situation. Therefore, the Court believes that a pharmaceutical sales representative, upon obtaining a commitment from a physician, has "in some sense" made a sale. *See* Dep't of Labor, Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees; Final Rule, Fed. Reg. 22122, 22162-63 (Apr. 23, 2004). Relatedly, where a pharmaceutical sales representative seeks to obtain a physician's professional c ommitment to prescribe certain pharmaceuticals, that representative was engaged in making sales. Importantly, Ms. Baum was not visiting the physician only to provide some education or background to pave the way, or prepare the physician for another appointment with a primary salesperson.

This Court believes that other courts, and perhaps regulatory agencies, underestimate the significance of this oral commitment from physicians.[25] In part, this error emerges from a misunderstanding of the ways in which human beings are socially and informally motivated. Sometimes lawyers and judges forget that a person's word means something; remarkably, many people do not actually need a 400-page contract to bind themselves to their word. Yale's Yochai Benklar, a thinker with incisive prescience, explains that non-market intrinsic factors can serve as a more powerful motivating force than typical extrinsic economic incentives;[26] applying such a theory to this situation, it is possible to imagine one business that thrives over

---

[25]As shown by the typical budgets allotted for pharmaceutical representative programs, pharmaceutical companies have not made the same mistake.

[26]*See* Yochai Benkler, *The Wealth of Networks* 92-99 (2006).

20

time, enjoying ongoing, non-contractual relationships with its clientele, while a nearly identical business falters, its obsession with formalized contracts driving away a clientele socially frustrated with the non-trusting relationship.[27] In short, this Court believes that one professional's commitment may be worth more in sales volume than a hundred firm orders from a insolvent or dishonest source. A proper critique of this interpretation of "sale" is that such reasoning, if applied in a broader sense across industries, would quickly arrive at an unsustainable breaking point. However, this Court is not broadening the definition of "sale", but simply seeking to understand and apply the definition within this particular industry. *See In Re Novartis Wage and Hour Lit.*, 593 F. Supp. 2d 637, 659 ("Reps make sales in the sense that sales are made in the pharmaceutical industry."). For all of the above reasons, this Court, in performing its own construction and application of this statutory exemption, finds that in the pharmaceutical context, where a representative asks for a commitment from a physician, such activity is sales activity for the purposes of the Pennsylvania outside sales exemption.

Admittedly, this construction and application has its weaker points: obviously, not every sale defined this way will actually result in the delivery of a pharmaceutical in exchange for legal tender. Furthermore, other courts, assessing different industries, have held that individuals seeking to obtain commitments are not necessarily performing exempt sales activity. *See, e.g.*, *Clements v. Serco,* 530 F.3d 1224, 1227 (10th Cir. 2008). Ms. Baum's briefing hopes to capitalize upon this particular weak point, arguing that even when a physician commits to writing a prescription for AstraZeneca's pharmaceuticals, this commitment is

---

[27]Such varying business realities exemplify the arbitrariness that could result from a too-narrow definition of sale.

21

certainly not binding upon either the physician or a patient. However, the rationale of such a critique could be equally applied to sales transactions in simpler fields. For instance, where a hypothetical Mr. Loman sells a widget, but the widget is ultimately returned six months later under a warranty claim, did a sale actually occur? Was the sale binding? Given this country's aggressive implied warranty laws, is any sale ever binding? While the Court is certain that Mr. Loman engaged in the process of making sales or obtaining orders, the question presents itself: is any traditional sale more or less binding than a commitment sought and obtained from a honest and thoughtful physician? Admittedly, in the pharmaceutical context, obtaining a commitment from a doctor may not be a formal, binding contract that inexorably leads to the exchange of goods and services. However, the Court believes such formalities are simply not necessary for a "sale" to occur. The Court notes that private companies perhaps have a wiser approach to discerning what constitutes a sale: rather than wasting effort and energy arguing about how to apply abstract and reduced definitions to diverse industries, such companies simply find and execute the methods that wor k to increase sales; notably, pharmaceutical companies have all decided to employ large, direct sales forces to visit physicians.

The Court also acknowledges that physicians are not the only customer involved in the sale of pharmaceuticals. However, it cannot be argued that physicians are not an integral and essential gatekeeper within this sales process. In some, likely most, instances, physicians will be the dispositive force behind a sale. Furthermore, in all instances, a physician's approval and consent to the sale is ultimately necessary. Other courts, in expressing their analyses of this pharmaceutical sales dynamic, have similarly stated the integral role of physicians in the sale of a pharmaceutical. *See Barnick v. Wyeth,* 522 F. Supp. 2d 1257, 1264 (C.D. Cal.

22

2007)(explaining that because physicians "determine whether or not a patient will buy a prescription product", the physicians themselves are the appropriate target of sales efforts); *see also D'Este v. Bayer Corp.*, No. 07-cv-3206, 2007 U.S. Dist. LEXIS 87229, at *14 (C.D. Cal. Oct. 9, 2007) (emphasizing that the doctor places the order for the prescription product by writing a prescription).

In sum, in a determination unnecessary to present to a jury, and following an analysis of the dynamics of the industry, this Court finds that where pharmaceutical representatives seek to obtain physician commitments to write prescriptions, these representatives make sales and are engaged in the process of making sales for purposes of Pennsylvania's outside sales exemption. In the alternative, this Court notes that a similar analysis could also be applied to pharmaceutical sales representatives "obtaining orders." Consequently, a pharmaceutical sales representative performing duties similar to those performed by Ms. Baum, including visiting the offices of physicians for the purposes of obtaining commitments, meets this requirement of the outside sales exemption.

### b. Ms. Baum Exhibits Numerous Indicia of Sales Activity, Confirming that She Was Employed for the Purpose of Making Sales

Having construed an integral term within the at-issue statute, and examined the nature of the industry, the Court now turns to specific relevant matters relating to Ms. Baum's position and actual work efforts. Such indicia of sales confirm the regulation's requirement that the employee be "employed for the purpose of and . . . customarily and regularly engaged" in

making sales or obtaining orders.[28] Ms. Baum's job exuded an overwhelming number of indicia of sales activity; such indicia, dispositive neither alone nor taken together, nonetheless provide weighty support that classifying Ms. Baum as exempt comports with the legislative purposes for the exemption. Additionally, these indicia of sales serve as strong points demarcating a distinguishing line between Ms. Baum's exempt sales employment and non-exempt promotional activities.

First, of minor significance, Ms. Baum referred to her job as a sales job. She described her function as a Pharmaceutical Sales Specialist as increasing the market share of AstraZeneca's prescription drugs through personal selling. She indicated to others how much she loved being in sales, and initially pursued the position because she "always wanted to be in sales." Also, AstraZeneca advertised and referred to the positions as sales positions. Both Ms. Baum and AstraZeneca referred to doctors as customers.

Additionally, Ms. Baum's position existed to help increase the sales of AstraZeneca products. Ms. Baum now attempts to argue that it was difficult to trace sales data directly to her own activity, given the extended nature of the above-discussed pharmaceutical purchase regime, and the imprecision of certain metrics used by AstraZeneca to measure sales. However, the Court finds that her arguments are unconvincing in that the record is replete with evidence showing that the purpose of her employ was to increase sales, and that metrics, even if imprecise, were used to track her success.

---

[28]These indicia of sales are not alone dispositive, but should be considered after a finding that sales have taken place. *Ruggeri v. Boehringer Ingelheim Pharms., Inc.*, 585 F. Supp. 2d 254, 266 (2008).

Importantly, Ms. Baum exhibited substantial discretion and showed creative thought in identifying and persuading high priority physicians within her area. She was responsible for managing and organizing her efforts at calling upon the approximately 150 physicians within her geographic territory. She regularly analyzed reports on various prescription-related data, to aid her in her sales efforts. She set sales goals in relation to her efforts and visits.

Also importantly, Ms. Baum utilized specialized sales training from AstraZeneca to engage doctors in interactive discussions about the doctor's willingness or hesitancy to prescribe AstraZeneca products. The primary purpose of her visits was to obtain, via a persuasive close, a physician's commitment to write more prescriptions for a particular AstraZeneca product. She asked physicians to prescribe AstraZeneca products on every sales call, having been trained specifically in the art of conducting these delicate closing efforts. Ms. Baum also sought to increase her persuasive skills and closing capacity, by increasing her knowledge about the pharmaceuticals and disease pathways; she even enrolled in outside courses.

Despite the substantial undisputed evidence of such indicia of sales, Ms. Baum, in her filings to the Court, now seeks to characterize her job efforts as simply reading from prepared scripts. However, even if initially planning to work from prepared scripts, Ms. Baum inevitably varied her presentation to effectively appeal to a particular physician. The record contains substantial evidence that Ms. Baum crafted her message to suit her audience, as is necessary in any sales or persuasive situation. Ms. Baum herself now disputes this notion, arguing instead that she simply repeated word for word memorized sales pitches. Yet this overstated, dubious assertion is controverted by numerous other sworn statements and representations that show that

25

interactions with physicians were inevitably individualized. For instance, Baum stated that she focused upon each particular physician's needs and worked to develop her selling skills. Her interactions with physicians varied in length, and she exercised judgment in ascertaining how to most effectively sell AstraZeneca's products. As other courts have founds, such individualized efforts are the hallmark of selling activities. *See, e.g., Menes v. Roche Labs., Inc.*, No. 2:07-cv-01444, 2008 U.S. Dist. LEXIS 4230, at *7 (C.D. Cal. Jan. 7, 2008); *Barnick*, 522 F. Supp. 2d at 1262-63. The Court is satisfied that based upon numerous examples within the record, no reasonable jury could possible agree with Plaintiff's conflicted argument that she was more promotional "pharm-robot" than salesperson.

Furthermore, Ms. Baum was not substantially supervised in her daily activities. Ms. Baum attempts to argue that she followed strict guidelines regarding what she did with her time, including policies governing how to respond to e-mails. However, the undisputed evidence shows that Ms. Baum exercised substantial discretion over the course of her activities, within generalized guidelines put out by AstraZeneca. In particular, Ms. Baum was only accompanied by a supervisor one day every one to two months.

Importantly, Ms. Baum received a bonus of additional compensation on the basis of certain sales metrics. The Court understands Ms. Baum's general compensation package as follows: she received a base salary, which was then supplemented by the FSIP supplemental bonus plan, tied to the total number of prescriptions, or new prescriptions filled within her assigned geography. *See* Doc. Nos. 53 and 63, ¶ 50. A hallmark of traditional outside sales relationships is the correlation of additional compensation with success in sales efforts. In many outside sales positions, this correlation is direct, meaning Mr. Loman is paid $50 for each

26

widget that he sells. Sometimes, this compensation tied directly to sales may be all that Mr. Loman is paid. In other instances, Mr. Loman may be paid a base salary, with additional compensation being tied to sales. In this instance, Ms. Baum was paid a substantial base salary. However, the record also shows that she received additional compensation that was somehow tied to her sales performance. Ms. Baum emphasizes the attenuated nature of the tying of the bonuses to the performance, due in part to inexact metrics; the Court finds this point, while relevant, is of minimal import. While the tying in this matter is not as direct as in the above example, it still exists in that Ms. Baum received compensation from AstraZeneca based upon her sales performance.

While these above indicia of sales are significant, this Court believes that Ms. Baum's classification as exempt turns upon a correct understanding of the nature of the pharmaceutical selling process. Having conducted that analysis, this Court found that making sales or obtaining orders in the pharmaceutical industry consists of obtaining commitments from doctors. Now, as adjunctive support of that finding, and as evidence that Ms. Baum was employed for the purpose of making sales, the Court further finds that Ms. Baum exhibited nearly every significant indicia of sales activity; these indicia corre spond with both the necessary line-drawing around the exemption, and the exemption's purposes. The exemption for outside sales activity exists in part due to the recognition of such salespeople as professionals possessing substantial bargaining power, and the further recognition that the nature of their work does not lend itself to supervision or specific hour requirements or limits. These rationales, representing the purpose and function of the outside sales exemption, and are easily met on these facts.

27

### c. Ms. Baum Spent Ninety Percent of Her Time Making Calls in the Field

Ms. Baum meets the second and third requirements of the outside sales exemption: the undisputed facts show that she was "customarily and regularly engaged more than 80% of work time away from the employer's place or places of business," and that she spent less than twenty percent of her work time performing non-exempt work. *See* 34 Pa. Code § 231.85(2). Non-exempt work is "work of a nature not directly related to and in conjunction with the making of sales." *Id.* Ms. Baum admitted that she spent ten to twelve hours per day in the field, making calls upon physicians. Ms. Baum further acknowledged spending only one hour per day at home, organizing her efforts. As a side issue, the Court believes that such organizing efforts are also exempt because they are directly related to her sales efforts. Regardless, though, Ms. Baum without question meets both time-oriented qualifications.

### 2. Conclusion: Ms. Baum Meets all Requirements of Pennsylvania's Outside Sales Exemption

This Court finds that upon the submitted evidence, no jury could reasonably find that Ms. Baum does not fit within the "outside sales" exemption. Nearly seventy years ago, in interpreting the analogous outside sales exemption in the Fair Labor Standard Act, the Tenth Circuit aptly explained the rationale behind this exemption:

> The reasons for excluding an outside salesman are fairly apparent. Such salesmen, to a great extent, work**** individually. There are no restrictions respecting the time he shall work and he can earn as much or as little, within the range of his ability, as his ambition dictates. In lieu of overtime, he ordinarily receives commissions as extra compensation. He works away from his employer's place of business, is not subject to the personal supervision of his employer, and his employer has no way of knowing the number of hours he works per day. To apply hourly standards primarily devised for an employee on a fixed hourly

28

> wage is incompatible with the individual character of the work of
> an outside salesperson.

*Jewel Tea Co. v. Williams*, 118 F.2d 202, 207-08 (10th Cir. 1941). This rationale for the FLSA outside sales exemption, as stated by the Tenth Circuit, remains viable today and is equally applicable to the Pennsylvania exemption; given that Ms. Baum exemplifies many of the attributes that drive the policy of the exemption, applying the exemption to her comports fully with the exemption's spirit, and the spirit behind the wage laws generally.

Ms. Baum, for purposes of this litigation, seeks to characterize her previous role as that of a mere "pharm-robot." The Court and the record disagree with this post-hoc characterization. The selling process, whether in pharmaceuticals, as detailed in the record in this matter, or any other field, is iterative, imaginative, challenging and demanding. Sales are the single undeniable limiting force in the growth and progress of nearly every company in the modern economy. No one can honestly say that a salesperson is effective simply by spitting out a memorized script; no one can imagine a company that would require rote adherence to planned words in any situation. Instead, successful companies acknowledge that an effective salesperson must exemplify the following abilities: talent for building personal relationships of trust; skill at effectively and concisely portraying a complicated message; knowledge and communication skills to overcome concerns; and pure charisma, required to effectively close. Such skills will always be in high demand.

The effective salesperson may be helpfully compared to a master fly fisherman: prepared with the appropriate tools, learned in the subject matter, and dedicated beyond the understanding of outsiders. Each possesses a similar innate and unteachable talent: the

29

fisherman pulls the hook at precisely the right time, tension and speed, just as a master salesperson conducts a close that effortlessly but firmly ensures a sale. Importantly, Ms. Baum prepared for and conducted closes, wherein she obtained commitments from doctors to prescribe AstraZeneca products.

In short, salespeople, including Ms. Baum, are professionals whose absence from the office makes it impossible, even with the magical advances of modern technology, to carefully supervise their hours. Furthermore, such professionals have sufficient leverage to negotiate excellent pay packages. The awareness of these attributes of salespeople led to Pennsylvania's adoption of an outside salesperson exception similar to that of the FLSA. Neither semantics nor overly narrow statutory constructions should be allowed to devalue such sales professionals by forcing upon them uniform and limiting labor protections; rather, professional salespeople are better left to negotiate their own contractual relationships, fending for themselves in their terms of employ, just as they do on calls in the field.

In sum, the Court concludes that Ms. Baum was directly engaged in "making sales" and obtaining orders, and meets all necessary requirements of Pennsylvania's outside salesperson exemption. Furthermore, the Court finds that there are no disputed material facts that could materially affect whether Ms. Baum should be seen as exempt.

## B.    In the Alternative, Ms. Baum's Would Likely Qualify for Pennsylvania's Administrative Exemption

As an alternative basis of decision, should Ms. Baum not be properly classified as an outside salesperson, the Court would likely find that Ms. Baum would still be exempt under Pennsylvania's administrative exemption. *See* 43 P.S. § 333.105(5); 34 Pa. Code § 231.83; *see*

30

*also Cote v. Burroughs Welcome Co.*, 558 F. Supp. 883, 885 (E.D. Pa. 1982) (finding that the administrative exemption is applicable to pharmaceutical representatives who call on physicians with the purpose of increasing sales). In particular, this Court would adopt an analysis similar to that expertly executed by the District of New Jersey, in *Smith v. Johnson and Johnson*, No. 06-cv-4787, 2008 WL 5427802 (D.N.J. Dec. 30, 2008) (holding that a pharmaceutical sales representative was properly classified as exempt under the FLSA's administrative exemption). Other persuasive cases have also held that pharmaceutical sales representatives meet administrative exemptions of the FLSA and other state laws. *See, e.g., In re Novartis Wage and Hour Lit*, 593 F. Supp. 2d 637 (S.D.N.Y. 2009); *Amendola v. Bristol-Myers Squibb*, 558 F. Supp. 2d 459, 470 (S.D.N.Y. 2008); *Cote v. Burroughs Wellcome Co.*, 558 F. Supp. 883 (E.D. Pa. 1982) (finding that FLSA's administrative exemption applied to a pharmaceutical company's detail persons).

Ms. Baum meets each prong of the relevant test. Her annual salary translates into $1211.54 per week, far more than that required. Furthermore, her sales and promotion efforts constitute nonmanual work directly related to the general operation of her employer. Such general operations include the "administrative operations of a business", including "representing the company [and] promoting sales." 29 C.F.R. § 205(c)(5)(2004). Finally, as discussed above, Ms. Baum, as required by the demanding task of any professional salesperson, exercised substantial discretion and independent judgment in organizing and executing her sales efforts. *See Wolfslayer v. Ikon Office Solutions, Inc.*, 2005 WL 18193, at *10 (E.D. Pa. Jan. 26, 2005)(explaining the relatively light standard for a job to require discretion and independent judgment).

## C. Court Need Not Reach Issue of Preemption

Because of the findings above, the Court sees no reason to discuss any of Defendant's preemption arguments.

## D. Other Pending Motions are Moot

Because of the Court's decision on Defendant's Motion for Summary Judgment, the three other pending motions in this matter (Doc. Nos. 19, 49 and 69) are hereby denied as moot, since the Court is without power to hear them, as their resolution could not affect the rights of the litigants in this matter. *See Surrick v. Killion*, 449 F.3d 520, 526 (3d Cir. 2006).

## IV. CONCLUSION

In conclusion, the Court finds that this decision properly applies both the text and purpose of the Pennsylvania exemption at issue. While the dividing line between non-exempt promotion and exempt sales may be difficult to draw, pharmaceutical sales representatives who perform job duties similar to those of Ms. Baum should be an easy case. The federal regulations enacted in relation to FLSA legislation emphasize the transaction itself; this Court's Opinion honors that emphasis by finding that obtaining a commitment from a physician, in the pharmaceutical sales context, is sufficient to constitute "making sales" or "obtaining orders." Past judicial emphasis upon the need for narrow construction of exemptions does not obviate the need for common-sense construction and applications.

Furthermore, in reviewing approximately ten other recent district court cases addressing similar situations, even though applying either federal or another state's law, nearly all found, for one reason or another, that the pharmaceutical salespeople at issue were exempt. The district j udges in these cases exhibit the wisdom and common sense to acknowledge that

sometimes, society is better off when a duck, walking and talking so, can simply be treated as one. Thus, Ms. Baum's job duties fit within the letter, but more especially the spirit of the exemption. As acknowledged by the existence of the exemption, the nature of the work performed by Ms. Baum sales does not lend itself to easy management or supervision; furthermore, competent and talented sales professionals, such as Ms. Baum, do not and should not be characterized and limited as a protected class having little bargaining power in relation to their employers. In sum, after considering the multitude of policy reasons as to why outside salespeople are exempt, the Court believes that Ms. Baum instantiates nearly all such rationales.

Furthermore, the Court finds that a trial would be superfluous, as a jury's resolution of any disputed facts in this matter would not change the outcome; under the undisputed material facts, Defendant AstraZeneca is entitled to judgment as a matter of law. An appropriate Order follows.

AND NOW, this 31st day of March, 2009, in accordance with the above analysis, IT IS HEREBY ORDERED THAT Defendant's Motion for Summary Judgment (Doc. No. 52) is GRANTED. IT IS FURTHER ORDERED that the following motions, Defendant's Motion to Strike (Doc. No. 19), Plaintiff's Motion to Certify Class (Doc. No. 49), and Plaintiff's Motion to Strike (Doc. No. 69), are DENIED as moot.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**